**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**B. J. PROVENZALE COMPANY, INC., d/b/a B. J. P. Painting and Decorating Co., Respondent.**

**No. 74–1495.**

United States Court of Appeals, Sixth Circuit.

March 19, 1975.

Elliott Moore, Deputy Associate Gen. Counsel, Peter G. Nash, John S. Irving, Patrick H. Hardin, Michael S. Winer, Frank C. Morris, Jr., N. L. R. B., Washington, D. C., Bernard Levine, Director, Region 8, N. L. R. B., Cleveland, Ohio, for petitioner.

Donald F. Woodcock, Calfee, Halter, Calfee, Griswold & Sommer, David E. Bishop, Cleveland, Ohio, for respondent.

Before LIVELY, Circuit Judge, and O'SULLIVAN and McALLISTER, Senior Circuit Judges.

PER CURIAM.

This case grows out of an unfair labor practice charge which was filed against the Company on September 12, 1972. On February 28, 1973, a hearing was held before Administrative Law Judge Wellington A. Gillis and, after an extensive hearing, Judge Gillis found that the Company had not violated Section 8(a)(1) or Section 8(a)(3) of the National Labor Relations Act, and granted the Company's motion to dismiss the complaint in its entirety.

The General Counsel filed exceptions to the Administrative Law Judge's Decision granting the Company's motion to dismiss.

On October 30, 1973, the National Labor Relations Board issued a Decision and Order in which it reversed the Administrative Law Judge's findings of fact and conclusions of law; found that the Company had violated the above-named Sections of the Act; and made the customary order to cease and desist, reinstate the discharged workers, and make them whole for any loss of earnings they may have suffered.

The Company filed a motion for Reconsideration, a Motion for Leave to File a Brief, and a Request for Oral Argument. The Board denied the three motions and, subsequently, petitioned this

court for enforcement of its order against the Company.

The respondent Company is, for the most part, engaged in maintenance work on a certain few buildings in Cleveland, occupied by the Sohio Standard Oil Company. With respect to the painting operations covered by agreement—the only phase with which this proceeding is concerned—Sohio controls the amount and type of work to be performed, designating from week to week the areas to be painted, and the number of the Company's painters to be used. It appears that the Company, as well as its predecessor, adhered to and assumed the Area-working Agreement of District Council No. 6 AFL–CIO of the International Brotherhood of Painters and Allied Trades, which is a labor organization within the meaning of Section 2(5) of the Act.

The respondent Company worked a crew of approximately ten men, subject to variance during the month of March, except for a period when there was no work. B. J. Provenzale was the President of this small Company and had the ultimate responsibility for all operations but placed the control of the painting crew in the hands of the foreman who, up to May 10, was Harold Solomon, and, thereafter, Oliver Miller. This authority, with occasional exceptions, extended to the foreman's selecting which painters would work on any given day or week.

Toward the end of March, President Provenzale received word from Sohio that there would follow a period of limited work, and that the Company could keep only a foreman and four painters. President Provenzale discussed the problem concerning the reduction of the painting crew with his foreman, Solomon, raising the possibility of commencing a rotation system. Solomon was reluctant to work such a system as he thought it more equitable to keep all of the men working some of the time. Nevertheless, Provenzale decided to institute a two-week rotation schedule, whereby half the men would work for two weeks, and then be laid off while the other half worked.

Provenzale was also confronted by a situation concerning the payment of the premium rate. Under a Union agreement with area painting contractors, to which Provenzale adhered, during the lull season between December and March, painters work on a basis of "seven for eight"—that is, seven hours' work for eight hours' pay. From the first working day in April, however, until December 1, the "seven for eight" does not apply, and painters are to be paid time and a half, premium rate, for night work.

On April 3, Provenzale called the painters to his office and told them that Sohio could not afford to pay the premium rate, and that if they wanted to continue working until Sohio and the Union could work something out, they would have to continue on the "seven for eight" basis. He then told the painters that, because of there not being much work, he was going to have to put the men on a rotation basis, indicating to them how it would work. The men decided to go ahead and expressed their willingness to go along with the rotation basis.

At some point during the discussion there was a reference to one of the painters, Tom Land, having gone to the Union on a matter relative to spray-painting wages. According to the testimony of one of the employees, Provenzale asked Land why he chose to go to the Union to collect his spray wages rather than coming directly to him and that "if he had any differences, he was to come to him, and not keep running down to the Union about it." Provenzale testified that he merely made a comment concerning spray painting to the effect he did not see why anyone had to go to the Union when he could come to him. This incident seems trivial and irrelevant, but it turns out that it is one of the chief foundations on which the Board found that the Company violated Section 8(a)(1) of the Act by threatening employees with discharge, or other reprisals, because they had taken grievances to the Union. There is fur-

ther evidence with regard to the situation, which will hereafter be recounted.

On April 5, Solomon, the foreman, spoke with Provenzale and told him that he had quit the job because of a number of harassing telephone calls from the men concerning unfair treatment, giving rise to his having become fearful for himself and his family. Provenzale was immediately distressed, and went to the seventh floor of the Guildhall Building, where the painting crew was working. He addressed the men, advising them of Solomon's quitting and letting them know how he felt about the entire matter. Provenzale stated that, "I did not care if my foreman was a Jew or if he was a black or what his origin was, and no one is going to run my foreman off the job." Provenzale also let the men know that if anyone did not like working under these conditions, he could quit.

These remarks were not directed to any particular person but later, at some point, Provenzale looked at Frank Land and stated that he did not "need no middle man running back to the Hall, complaining about what was going on in this building." Later, about April 10, Provenzale, in a conversation with three painters including Tom Land, stated: "What the hell is this about you and your nephew going to Union Hall?" Tom did not reply. About this time, after several weeks of negotiations, the Company and the Union entered into a maintenance agreement providing for a reduced painting crew, as decided by Provenzale, which crew consisted of four painting employees, under Foreman Solomon. Tom and Frank Land were among those laid off.

■ The claim is made that the laying off of the Lands by the Provenzale Company was an unfair labor practice within the meaning of 8(a)(1) and 8(a)(3) of the Act. In our view this is an untenable charge. The laying off of Frank Land, Jr., and Thomas Land did not constitute an unfair labor practice. There was no evidence of any attempt to coerce the Lands in the exercise of their rights to engage in concerted activities for the purpose of mutual aid or protection. There was no threat of reprisals in any of the language addressed by Provenzale to the Lands. In this regard, it should be noted that before laying off the six men, including the Lands, Provenzale reacted to a diminution of his business by putting into effect a rotation system, whereby each painter would work two weeks, and then be laid off for two weeks. Certainly, if Provenzale had wished to discharge the Lands, he could have discharged them before instituting the rotation system. This system clearly shows Provenzale was trying to keep all of the men, including the Lands, as painters on the job by means of the rotation plan.

A week or so after the layoff, when there was a slight increase in work, Provenzale testified that he told Roberta Smedley, his secretary, to call both Lands. She testified she called both several times, and finally got in communication with the wife of one of them, leaving word that there was work available for both men. Miss Smedley could not remember with which wife she talked. Both wives denied that either had received such a call, but the Administrative Law Judge stated in his decision that he was so impressed with Miss Smedley's forthrightness that she appeared to be the one most believable, and that, therefore, he credited her testimony.

The Lands had gone to Mr. Kramer, the business representative of the Union, stating they had not received the proper amount of pay for a job. He told them he would get it straightened out. He got in touch with Mr. Provenzale and the Lands almost immediately received the small amount of six dollars about which they were concerned.

There were never any complaints filed by employees against the Company except—if it could be called a complaint—that of the Lands about the six-dollar shortage in their wages for spray painting.

Mr. Provenzale testified that his company wanted to be friendly with the Un-

ion. He never manifested to Mr. Kramer any objection to Union activities by his employees. He never manifested to Mr. Kramer any anti-Union feelings, according to Mr. Kramer's testimony. There was no evidence of any anti-Union prejudice, or anti-Union animus on the part of the Company.

The Administrative Law Judge was correct in finding that Mr. Provenzale's statement to the Lands was not an evidence of anti-Union feeling, but that he was put out because the Lands had skipped the normal first step of making a complaint to him before complaining to the Union, which was provided in the contract between the Union and the Company in "Article V—Grievance Procedure," as follows:

"(1) All Grievances, other than those pertaining to general wage rate or jurisdictional disputes that may arise on any work covered by this Agreement, shall be handled in the following manner:

(a) Step I: Between the aggrieved employee and/or his shop steward or both and the company supervisor of the craft."

■ That Mr. Provenzale was annoyed because the Lands had taken their trivial grievance to the Board instead of directly to him, as provided by the Union-Provenzale contract, does not show the Lands' discharges were actuated by hatred, anger, or anti-Union animus. There was simply a necessary reduction of employees.

There is no evidence of any violation by the Company of Sections 8(a)(1) or 8(a)(3).

In conclusion, we are in accord with the findings of fact and conclusions of law of Administrative Judge Gillis in holding that the Respondent Provenzale Company did not engage in any unfair labor practices as alleged in the Complaint. The Order of the Board to the contrary is not sustained by substantial evidence, and enforcement of its Order is denied.