The MARTIN–BROWER COMPANY,
Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent.

No. 78–1025.

United States Court of Appeals,
Sixth Circuit.

Argued March 31, 1980.

Decided July 1, 1980.

Don A. Banta, James R. Cox, J. Kevin Hennessey, Naphin, Banta & Cox, Chicago, Ill., T. Kennedy Helm, Jr., Stites, McElwain & Fowler, Louisville, Ky., R. E. Seibert, Dir., Industrial Relations, Des Plaines, Ill., for petitioner.

Elliott Moore, Elinor H. Stillman, Deputy Associate Gen. Counsel, Charles P. Donnelly, N.L.R.B., Washington, D. C., Emil C. Farkas, Director, Region 9, N.L.R.B., Cincinnati, Ohio, for respondent.

Before BROWN, KENNEDY and JONES, Circuit Judges.

BAILEY BROWN, Circuit Judge.

A charge was filed against petitioner company alleging that it had violated Section 8(a)(1) and (3) of the National Labor Relations Act by discharging employee Earnest J. Ingram. The Board concluded that the company did indeed violate the act by discharging the employee for his union sympathies and activities. 233 N.L.R.B. No. 130. The company then petitioned this court to review and set aside the Board's decision, claiming that Ingram was discharged because of a company policy that required the dismissal of a driver who was involved in three "preventable" accidents within a twelve-month period. The Board cross-applied for enforcement of its order. Finding no substantial evidence in the record for the Board's conclusion, we reverse and therefore deny enforcement of the Board's order.

The Martin-Brower Company is engaged in the warehousing and distribution of food, paper and related products for the fast-food industry. The firm operates centers in Columbus, Ohio, Louisville, Kentucky, Atlanta, Georgia and Indianapolis, Indiana. This case centers on events taking place at the Columbus center.

Earnest J. Ingram was employed as a truckdriver at the Columbus center since January 6, 1975. He was discharged by the company on November 5, 1976. On November 11, 1976, Ingram filed a charge with the National Labor Relations Board, alleging that he was unlawfully discharged by the company because of his union sympathy and activity. The company responded by arguing that Ingram was discharged because he was involved in three "preventable" accidents within a twelve-month period. The Board found that the company's use of the three-accident policy in Ingram's case was merely a pretext for an unlawful discharge. The Board's findings can only be upheld if based upon substantial evidence. *Universal Camera Corp. v. N.L. R.B.*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951).

The three-accident policy was a company-wide regulation providing for the mandatory termination of drivers who incur three "preventable" accidents within a twelve-month period. An accident is "preventable" if the driver failed to do everything he reasonably could have done to prevent or avoid the accident. The policy is largely enforced by the individual center. When an accident occurs, the driver fills out a report, which is filed with center management. A preliminary ruling is then made by this group and then submitted to the corporate headquarters in Chicago. An adverse ruling may be appealed by the driver to the National Safety Council, whose decision is final and binding on the driver and the company.

Ingram's first two accidents occurred on February 12, 1976 and June 10, 1976. Both of these accidents were ruled preventable by the center and affirmed by the corporate headquarters. Neither was appealed by Ingram to the National Safety Council.

On September 12, 1976, Ingram was involved in a third accident while driving up a steep incline in a motel parking lot. As he began to make a turn, an automobile attempted to pass him on the right. The front wheel of Ingram's truck hit the left front fender of the car.

The following day, Ingram turned in an accident report to the center. After conferring, Distribution Manager Ranier Hock and Transportation Manager Robert Mohrhusen recommended that, although it was in a "gray" area, the accident would be

ruled "nonpreventable." That is to say, right after this third accident that occurred on September 12, the local management people, Hock and Mohrhusen, gave Ingram the benefit of a doubt and thereby ruled in his favor. The report was then sent on to corporate headquarters. On October 4, 1976, the Corporate Fleet Administrator, R. W. Coker, sent a letter to the Columbus center in which he ruled Ingram's third accident "preventable." The letter read:

I received the accident report for E. Ingram of 9/12/76, where he was turning in a parking lot and collided with a car. Your ruling was non-preventable because you felt that because our vehicle was moving 1 or 2 miles per hour, and the other vehicle should not have been so close to our vehicle.

Corporately, I am recording a preventable ruling because a professional driver always checks his mirrors before turning, and the car would have been visible had he done so.

I am sending copies of the National Safety Council's Accident Reports and you can have the driver complete them, and the ruling of the National Safety Council Committee [sic] is final and binding. Have the driver carefully complete the forms, completing all blanks, and return all six copies to me.

\* \* \* \* \* \*

According to Corporate ruling, three preventable accident [sic] in a 12 month period calls for termination. Let me know what you decide.

Ingram was discharged on November 5, 1976. On November 11, 1976, he called manager Mohrhusen and requested a Center Safety Committee ruling on the third accident. On the same day, Mohrhusen asked Ingram to come in and fill out a report for the National Safety Council. On November 13 the Safety Committee re-enacted the accident in the company parking lot. The committee, which consisted of two managers and two drivers, found the acci-

dent to be preventable by a vote of 3 to 1. One of those voting the accident "preventable" was assistant union steward Roger Krebs. On December 1, 1976, the National Safety Council also ruled the accident preventable.

■ It cannot be seriously argued by the company that there is no substantial evidence in the record to support the Board's findings that union activity was underway at the Columbus center, that Ingram was involved in this activity, and that the company was aware of his sympathy and involvement with the union. We do, however, find merit in the company's argument that there is no substantial evidence in the record, viewed as a whole, for the Administrative Law Judge's conclusion that Ingram was fired because center management was "surprised" by his union sympathy. The Board attempts to argue on appeal that Ingram was discharged because higher corporate officials were pressuring Hock and Mohrhusen to fire Ingram because of the fear that he might "spearhead" a union organizing drive at the Columbus center. There is no mention of this theory in the ALJ's findings, and we therefore must limit our review to the motive for discharge advanced by the ALJ, and ultimately, the Board.[1]

The ALJ made the following findings as to the motive for Ingram's discharge:

The evidence shows that Hock and Mohrhusen were aware of the early organizing activities but were of the opinion, as were many of the drivers, that Ingram was loyal to management and unsympathetic to union organization. Hock and Mohrhusen learned, however, that Ingram had become interested in organizing the Union. Mohrhusen testified about Ingram's changed attitude and their less cordial relations, and Hock admitted questioning Ingram in the office because Mohrhusen had said Ingram was "upset" and this upset him. *Hock admitted that in this conversation, which he*

1. The Board's order adopted the conclusions and recommendation of the Administrative Law Judge. The only exception to this was

that the Board modified the Administrative Law Judge's computation of interest on the remedy.

*said occurred in late August,* they discussed work problems, which Hock said should be taken up through the supervisory chain; *that Ingram said some employees were going to the Union hall and he was thinking of going also*; and that Hock told Ingram he did not believe the Union would solve his problems. *I therefore do not credit Hock's testimony that he did not think Ingram was pro-Union and that Ingram did not do or say anything to show he was pro-Union.*

\* \* \* \* \* \*

I find, based upon the evidence in its entirety, that Mohrhusen told Ingram the Respondent would not terminate him for minor accidents, that Ingram was given no written warning or suspension for the first two accidents, and that the *Respondent first ruled the third nonpreventable. Hock and Mohrhusen learned, however, that Ingram had become interested in Union organization as he admitted to them, and evidently resented this change* in allegiance on the part of an employee who was theretofore believed to be loyal to management and unsympathetic to a union.

\* \* \* \* \* \*

*I am convinced, and find, that the Respondent in the present circumstances would not have terminated Ingram, an admittedly excellent employee, because of his accidents were it not for its resentment of his switch to pro-Union sympathy.* I find that the discharge was therefore discriminatory.

(emphasis added). It is clear that the ALJ based her conclusions upon the finding that local management resented Ingram's "switch to pro-Union sympathy." We do not believe that there is any support in the record for this theory.

■ The ALJ relied on the testimony of Ingram and fellow drivers to show that the center was aware of Ingram's union sympathies as early as June, 1976. In one paragraph of her decision, quoted *supra*, the ALJ discredited the testimony of manager Ranier Hock that he was unaware of Ingram's union sympathies in August, 1976.

She then concluded that it was this discovery that prompted Hock and Mohrhusen to change their attitude about Ingram's third accident and discharge him. However, the ALJ's decision itself notes that Hock and Mohrhusen were aware of Ingram's union activity *before* they ruled the third accident nonpreventable. The decision therefore completely overlooks the favorable action taken by Hock and Mohrhusen toward Ingram when they ruled his September 12, 1976 accident "nonpreventable" and recommended that corporate headquarters do the same. As the company notes, if it harbored any resentment at all toward Ingram, it would surely have ruled the accident preventable at the first opportunity. The fact that Hock and Mohrhusen took such favorable action in Ingram's behalf, despite knowledge of his union sympathy, demonstrates the lack of an anti-union animus. In *N.L.R.B. v. B. J. Provenzale Co., Inc.,* 512 F.2d 599 (6th Cir. 1975), we rejected the Board's finding of an 8(a)(1) and (3) violation, where the employer took favorable action toward employees prior to the allegedly discriminatory acts.

In this regard, it should be noted that before laying off the six men, including the Lands, Provenzale reacted to a diminution of his business by putting into effect a rotation system, whereby each painter would work two weeks, and then be laid off for two weeks. Certainly, if Provenzale had wished to discharge the Lands, he could have discharged them before instituting the rotation system. This system clearly shows Provenzale was trying to keep all of the men, including the Lands, as painters on the job by means of the rotation plan.

*Id.* at 601. Therefore, in the instant case, if an anti-union motive for Ingram's discharge ever existed, it must have resulted from some incident occurring after Hock and Mohrhusen acted favorably to Ingram by ruling the third accident nonpreventable. However, the ALJ (and the Board) based their findings on the resentment Hock and Mohrhusen allegedly felt upon finding out that Ingram was in favor of a union. Since

this would necessarily have occurred prior to the nonpreventable ruling, it is obvious that the evidence in the record could not support the Board's finding of an unlawful discharge.

We have carefully considered the parties' other arguments and find them to be without merit.

The decision and order of the Board are not sustained by substantial evidence, and enforcement of its order is hereby denied.